## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| GENVEC, INC., WAYNE T. HOCKMEYER, WILLIAM N. KELLEY, STEFAN D. LOREN, QUINTEROL J. MALLETTE, MICHAEL RICHMAN, MARC R. SCHNEEBAUM, DOUGLAS J. SWIRSKY, INTREXON CORPORATION,  and INTREXON GV HOLDING, INC., | ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) | |

### COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

### SUMMARY OF THE ACTION

1.    This action stems from a proposed transaction announced on January 24, 2017 (the "Proposed Transaction"), pursuant to which GenVec, Inc. ("GenVec" or the "Company") will be acquired by Intrexon Corporation ("Parent") and Intrexon GV Holding, Inc. ("Merger Sub," and together with Parent, "Intrexon").

2.    On January 24, 2017, GenVec's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Intrexon.  Pursuant to the terms of the Merger Agreement, for each share of GenVec common stock they own, shareholders of GenVec will receive 0.297 shares of Intrexon

common stock, plus one contingent payment right ("CPR") that will entitle each holder to receive from Intrexon an amount in cash (or, in certain circumstances, shares of Intrexon common stock) equal to (i) 50% of (a) all milestone payments, if any, made by Novartis Institutes for BioMedical Research, Inc. ("Novartis") for milestones that are achieved or occur under the Research Collaboration and License Agreement between GenVec and Novartis, dated January 13, 2010 (the "NVS License Agreement"), during the 36-month period following the effective time of the Proposed Transaction, and (b) all royalty payments, if any, made by Novartis under the NVS License Agreement during such 36-month period, divided by (ii) all then-outstanding CPRs.

3.      Based on Intrexon's stock closing price of $22.09 on January 23, 2017, the last trading day prior to the public announcement of the Proposed Transaction, the implied value of the merger consideration (not including any payments with respect to any CPRs) was $6.56 per share. However, since that time, Intrexon's stock price has fallen, closing as low as $18.93 on March 23, 2017, which represents an implied merger consideration value of only $5.62 per share. That same day, the Company's stock price closed at $6.00 per share, representing a $0.38 per share premium to the implied merger consideration. The Board failed to negotiate for a collar that would protect GenVec's stockholders from this foreseeable decline in Intrexon's stock price.

4.      On March 17, 2016, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

5.      The Registration Statement, which recommends that GenVec's stockholders vote in favor of the Proposed Transaction, omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly,

plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of GenVec common stock.

10.     Defendant GenVec is a Delaware corporation and maintains its principal executive offices at 910 Clopper Road, Suite 220N, Gaithersburg, Maryland 20878.  GenVec's common stock is traded on the NasdaqCM under the ticker symbol "GNVC."

11.     Defendant Wayne T. Hockmeyer ("Hockmeyer") has served as a director of GenVec since December 2000.  According to the Company's website, Hockmeyer is a member of the Nominating and Corporate Governance Committee, is the Chair of the Compensation Committee, and served as Chairman of the Board from November 2013 until October 2016.

12.     Defendant William N. Kelley ("Kelley") has served as a director of GenVec since

June 2002.   According to the Company's website, Kelley is Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

13.    Defendant Stefan D. Loren ("Loren") has served as a director of GenVec since September 2013.   According to the Company's website, Loren is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

14.    Defendant Quinterol J. Mallette ("Mallette") has served as a director of GenVec since October 2014.  According to the Company's website, Mallette is a member of the Audit Committee.

15.    Defendant Michael Richman ("Richman") is a director of GenVec.  According to the Company's website, Richman has served as Chairman of the Board since October 20, 2016.

16.    Defendant Marc R. Schneebaum ("Schneebaum") has served as a director of GenVec since April 2007.  According to the Company's website, Schneebaum is a member of the Compensation Committee and the Chair of the Audit Committee.

17.    Defendant Douglas J. Swirsky ("Swirsky") has served as a director, President, and Chief Executive Officer ("CEO") of GenVec since September 2013.

18.    The defendants identified in paragraphs 9 through 15 are collectively referred to herein as the "Individual Defendants."

19.    Defendant Parent is a Virginia corporation with its principal executive offices located at 20374 Seneca Meadows Parkway, Germantown, Maryland 20876.

20.    Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action on behalf of himself and the other

public stockholders of GenVec (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22.     This action is properly maintainable as a class action.

23.     The Class is so numerous that joinder of all members is impracticable. As of September 7, 2016, there were approximately 22,736,316 shares of GenVec common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

24.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

25.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on

behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

28.    GenVec is a clinical-stage gene delivery company focused on developing a pipeline of cutting-edge therapeutics and vaccines using its proprietary AdenoVerse platform.

29.    The Company is a pioneer in the design, testing, and manufacture of adenoviral-based product candidates that can deliver on the promise of gene-based medicine.

30.    GenVec's lead product candidate, CGF166, is licensed to Novartis and is currently in a Phase 1/2 clinical study for the treatment of hearing loss and balance disorders.

31.    In addition to its internal and partnered pipeline, the Company is also focused on opportunities to license its proprietary technology platform, including vectors and production cell lines, for the development and manufacture of therapeutics and vaccines to the biopharmaceutical industry.

### *The Flawed Process Leading to the Proposed Transaction*

32.    On May 19, 2016, Thomas Reed, Ph.D., Founder and Chief Science Officer of Intrexon, met with Individual Defendant Swirsky, President and CEO of GenVec, to discuss the possibility of a strategic transaction between GenVec and Intrexon.

33.    After several discussions between representatives of Intrexon and GenVec over the following months, on November 22, 2016, Intrexon delivered to GenVec a letter expressing interest in pursuing a strategic transaction with GenVec and requesting that the two companies negotiate an exclusivity agreement to provide Intrexon with an exclusive period of time to evaluate the opportunity and to conduct due diligence on GenVec.  The Registration Statement, however, fails to disclose the terms of the proposed strategic transaction.

34.     On November 25, 2016, the GenVec Board met and authorized Swirsky to enter into the exclusivity agreement, despite the fact that the Board failed to reach out to, or even consider reaching out to, any other third parties to determine their potential interest in a transaction with the Company.   On November 29, 2016, GenVec and Intrexon executed an exclusivity agreement, which provided that, between November 29, 2016 and January 23, 2017, GenVec would refrain from, among other things: (i) soliciting or accepting any offers for the acquisition of 20% or more of its outstanding securities or all of its assets; (ii) disclosing any non-public information to any entity with respect to such offers; or (iii) entering into any agreement relating to such offers.

35.     On December 28, 2016, GenVec received a non-binding proposal from Intrexon to acquire 100% of the issued and outstanding stock of GenVec, in a stock-for-stock transaction, at an implied price of between $3.75 and $3.85 per share.  After considering Intrexon's offer, the Board determined to reject the proposal.

36.     On January 20, 2017, Intrexon provided GenVec with a revised proposal to acquire 100% of the issued and outstanding stock of GenVec at a price of $6.00 per share delivered in the form of Intrexon common stock plus a CPR covering the next milestone to be received under the NVS License Agreement.  After a couple of counteroffers, Intrexon offered to acquire GenVec for Intrexon common stock having a value of $7.00 per share of GenVec common stock (which is a premium to the current value of the merger consideration) plus 50% of the milestone payments received under the NVS License Agreement during the next 36 months.   Swirsky immediately responded that the companies should move forward on negotiating transactions documents under those terms, despite the fact that he had not communicated the proposal to, or received approval from, the GenVec Board.  The Board never

negotiated for a collar to protect GenVec stockholders from any foreseeable declines in Intrexon's stock price.

37.    On January 21, 2017, the Board met and determined to go forward with Intrexon's offer, despite the fact that the Board had not retained or received advice from a financial advisor that could opine on the adequacy of the consideration offered by Intrexon. Only after receiving advice from its legal counsel at this meeting (and after deciding to move forward with Intrexon's offer) did the Board discuss engaging a financial advisor to assess the proposed transaction with Intrexon.  Notably, the Board determined that it would only engage a financial advisor "to deliver to GenVec an opinion as to the financial fairness of the transaction," but not to solicit interest from other third parties to attempt to maximize stockholder value.  At this meeting, the Board authorized Swirsky to engage Roth Capital Partners, LLC ("Roth") as GenVec's financial advisor to provide a fairness opinion, but the Registration Statement fails to disclose the reason the Board selected Roth and it fails to disclose the past services that Roth has provided to each of GenVec and Intrexon.

38.    Also at the January 21, 2017, the Board determined to create a special committee of the Board to "consider the terms of and negotiate the Intrexon transaction," but the Registration Statement fails to disclose the reason the Board deemed it necessary to form a special committee, including whether it was due to any perceived conflicts of interest.  Notably, however, the Registration Statement states that the Board's legal counsel "advised the GenVec board of directors of its considerations in connection with a potential conflict of interest if Intrexon were to offer the executives of GenVec employment with Intrexon prior to the closing of the transaction with Intrexon."  The Registration Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of GenVec's

officers and directors, including who participated in all such communications.

39.     In a rush to sign a deal with Intrexon, and without contacting any other potentially interested parties, the Board negotiated the terms of the Merger Agreement over the next three days.  In that same short time period, Roth prepared valuation analyses that it presented to the Board on January 24, 2017, but the Registration Statement fails to disclose a fair summary of each of those analyses.  After receiving Roth's opinion that the merger consideration was financially fair, the Board approved the Proposed Transaction and authorized the execution of the Merger Agreement.  Despite the Board's failure to contact any other third parties to maximize stockholder value, the Board failed to negotiate for a "go-shop" period that would allow GenVec to soloist third party offers after executing the Merger Agreement.

***The Preclusive Terms of the Merger Agreement***

40.     On January 24, 2017, the Board caused the Company to enter into the Merger Agreement, pursuant to which GenVec will be acquired for inadequate consideration.

41.     Pursuant to the terms of the Merger Agreement, shareholders of GenVec will receive 0.297 shares of Intrexon common stock, plus one CPR that will entitle each holder to receive from Intrexon an amount in cash (or, in certain circumstances, shares of Intrexon common stock) equal to (i) 50% of (a) all milestone payments, if any, made by Novartis for milestones that are achieved or occur under the NVS License Agreement, during the 36-month period following the effective time of the Proposed Transaction, and (b) all royalty payments, if any, made by Novartis under the NVS License Agreement during such 36-month period, divided by (ii) all then-outstanding CPRs.

42.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger

Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 5.3(a) of the Merger Agreement states:

> (a) From and after the date hereof until the Effective Time, the Company shall, and shall cause its Representatives to, (x) immediately cease and cause to be terminated any discussions or negotiations with any Third Party that may be ongoing as of the date hereof with respect to any Acquisition Proposal, and (y) deliver a written notice to any such Third Party to the effect that the Company is terminating all discussions and negotiations with such Third Party with respect to any Acquisition Proposal, and requesting that such Third Party promptly return or destroy all confidential information concerning the Company. Except as expressly permitted by this Section 5.3, from and after the date hereof until the Effective Time, or, if earlier, the termination of this Agreement in accordance with Article 7, the Company shall and shall cause its Representatives to not on behalf of the Company, initiate, solicit, facilitate or knowingly encourage any Acquisition Proposal or the making or submission thereof, or engage in, continue or otherwise participate in any discussions or negotiations with a Third Party regarding any Acquisition Proposal (other than to inform any Third Party of the existence of the provisions contained in this Section 5.3) or furnish or provide any nonpublic information in connection with any Acquisition Proposal. Except as expressly permitted by this Section 5.3, from and after the date hereof until the Effective Time, or, if earlier, the termination of this Agreement in accordance with Article 7, neither the Company Board nor any committee thereof shall (i) adopt, approve or recommend, or publicly propose to adopt, approve or recommend, any Acquisition Proposal, (ii) withdraw, change, qualify, withhold or modify, or publicly propose to withdraw, change, qualify, withhold or modify, in a manner adverse to Parent or Merger Sub, the Company Board Recommendation, (iii) fail to include the Company Board Recommendation in the Proxy Statement, (iv) in the event a tender offer that constitutes an Acquisition Proposal subject to Regulation 14D under the Exchange Act is commenced, fail to recommend against such Acquisition Proposal in any solicitation or recommendation statement made on Schedule 14D-9 within ten (10) Business Days of such commencement, (v) approve, authorize or cause or permit the Company to enter into any merger agreement, acquisition agreement, letter of intent, memorandum of understanding or other similar agreement relating to any Acquisition Proposal (a "Company Acquisition Agreement"), or (vi) resolve or agree to do any of the foregoing (any action set forth in the foregoing clauses (i) through (vi) of this sentence, a "Change of Board Recommendation").

43.     Further, the Company must promptly advise Intrexon, within twenty-four hours, of any proposals or inquiries received from other parties.   Section 5.3(c) of the Merger Agreement states:

> (c) The Company shall promptly (and in any event within 24 hours) notify Parent in writing of the receipt of any Acquisition Proposal, which notice shall identify the Third Party making such Acquisition Proposal and include a copy of such Acquisition Proposal (or, where such Acquisition Proposal was not submitted in writing, a reasonably detailed written description of such Acquisition Proposal including a summary of its material terms and conditions).  Without limiting the foregoing, the Company shall keep Parent promptly informed (and in any event within 24 hours) in all material respects of the status of, and any material communications relating to, such Acquisition Proposal (including any change in the price or other material terms thereof). The Company shall not terminate, amend, modify, waive or fail to enforce any provision of any "standstill" or similar obligation of any Person unless the Company Board ( or a duly authorized committee thereof) determines in good faith, after consultation with its outside legal counsel, that the failure to take such action would breach, or would reasonably be expected to breach, its fiduciary duties under applicable Law; provided, that the Company promptly (and in any event within 24 hours) advises Parent that it is taking such action.

44.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Intrexon a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 5.3(d) of the Merger Agreement provides:

> (d) Notwithstanding anything to the contrary contained in Section 5.3(a), if the Company has received a bona fide written Acquisition Proposal from a Third Party (other than as a result of a breach of this Section 5.3) that the Company Board (or any duly authorized committee thereof) determines in good faith, after consultation with its financial advisors and outside legal counsel, constitutes a Superior Proposal, the Company Board may at any time prior to the receipt of the Company Stockholder Approval, effect a Change of Board Recommendation with respect to such Superior Proposal (and terminate this Agreement pursuant to Section 7.1(g)), subject to the requirements of this Section 5.3(d). The Company shall not be entitled to effect a Change of Board Recommendation pursuant to this Section 5.3(d) (or terminate this Agreement pursuant to Section 7.1(g)) unless:
>
> (i) the Company Board shall have determined in good faith, after consultation with its outside legal counsel, that the failure to make such a Change of Board

Recommendation in response to the receipt of such Superior Proposal would breach, or would reasonably be expected to breach, its fiduciary duties under applicable Law;

(ii) the Company shall have provided to Parent at least three (3) Business Days' prior written notice (the "Notice Period") of the Company's intention to take such actions, which notice shall specify the basis for such Change of Board Recommendation, the identity of the Third Party making such Superior Proposal, the material terms and conditions of such Superior Proposal, and shall include a copy of the applicable Company Acquisition Agreement and any other material documents with respect thereto,

(iii) during the Notice Period, if requested by Parent, the Company shall have, and shall have caused its Representatives to have, engaged in good faith negotiations with Parent and its Representatives regarding any amendments or modifications to this Agreement proposed in writing by Parent and intended to cause the relevant Acquisition Proposal to no longer constitute a Superior Proposal; and

(iv) at the end of such Notice Period, the Company Board shall have considered in good faith any proposed amendments or modifications to this Agreement (including a change to the price terms hereof) and the other agreements contemplated hereby that may be offered by Parent in writing (the "Proposed Changed Terms") no later than 11:59 a.m., New York City time, on the last day of the Notice Period and shall have determined in good faith, after consultation with its financial advisors and outside legal counsel, that the Superior Proposal would continue to constitute a Superior Proposal if such Proposed Changed Terms were to be given effect and that failure to make a Change of Board Recommendation with respect to such Superior Proposal would reasonably be expected to breach its fiduciary duties under applicable Law.

In the event of any change to the price terms or any other material revision or amendment to the terms of such Superior Proposal, the Company shall be required to deliver a new written notice to Parent and to again comply with the requirements of this Section 5.3(d) (which shall apply *mutatis mutandis*) with respect to such new written notice.

45.     Further locking up control of the Company in favor of Intrexon, the Merger Agreement provides for a "termination fee" of $550,000, payable by the Company to Intrexon if the Individual Defendants cause the Company to terminate the Merger Agreement.  The Company may also be required to reimburse Intrexon's expenses.

46.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

47.     The consideration to be provided to plaintiff and the Class in the Proposed Transaction is inadequate.

48.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

49.     The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the Proposed Transaction.

50.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

***The Registration Statement Omits Material Information, Rendering It False and Misleading***

51.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

52.     The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

53.     First, the Registration Statement omits material information regarding GenVec's financial projections and the financial analyses performed by the Company's financial advisor, Roth, in support of its so-called fairness opinion.

54.     For example, with respect to Roth's Discounted Cash Flow Analysis, the Registration Statement fails to disclose the definition of "unlevered free cash flow" as used in Roth's analysis, which is particularly important since it appears that Roth and/or GenVec

management did not use the generally accepted definition to calculate GenVec's unlevered free cash flows. Further, although the Registration Statement purports to show the risk adjusted "cash flows" of GenVec's CGF166 and FMD programs, it fails to disclose the Company's standalone unlevered free cash flow projections and the line items used to calculate those projections. Additionally, the Registration Statement fails to disclose Roth's basis for calculating terminal values based on declining cash flow at a rate of 3.0% to 7.0%.

55.     Additionally, according to the Company's most recent Form 10-K filed with the SEC on March 6, 2017, the Company has net operating loss ("NOL") carryforwards of approximately $253.0 million for U.S. federal income tax purposes available to offset future taxable income and U.S. federal and state research and development tax credits of $7.5 million. The Registration Statement fails to disclose whether Roth valued these NOLs and tax credits or incorporated them into its valuation analyses and, if so, the Registration Statement fails to quantify these NOLs and tax credits. If Roth did not, the Registration Statement should provide stockholders with an explanation for Roth's failure to do so.

56.     Further, the Registration Statement indicates that, although the Registration Statement describes summaries of certain analyses performed by Roth, "they are not a comprehensive description of all analyses and examinations actually conducted by Roth." Stockholders are entitled to a fair summary of each of the valuation analyses that Roth performed in connection with its engagement by GenVec.

57.     With respect to the Company's financial projections, the Registration Statement fails to provide a reconciliation of all non-GAAP to GAAP financial metrics. Notably, defendants admit in the Registration Statement that "Non-GAAP financial measures should not be considered a substitute for, or superior to, financial measures determined or calculated in

accordance with GAAP," yet they failed to provide stockholders with those GAAP measures.

58.    When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

59.    The omission of this material information renders the Registration Statement false and misleading, including, inter alia, the following sections of the Registration Statement: (i) "Opinion of Roth Capital Partners as GenVec's financial advisor" and (ii) "Certain financial projections of GenVec's management."

60.    Second, the Registration Statement omits material information regarding potential conflicts of interest of Roth.

61.    For example, although the Registration Statement indicates that "Roth in the past has provided and may in the future provide investment banking and other financial services to GenVec and its affiliates for which Roth and its affiliates have received, or, in the case of future services, may receive, compensation," it fails to disclose the specific nature and timing of those services, as well as the compensation earned in connection with those past services.

62.    Additionally, the Registration Statement completely fails to disclose whether Roth has provided any services to Intrexon or any of its affiliates in the past and, if so, the nature, timing, and compensation earned for those services.

63.    Full disclosure of investment banker compensation and all potential conflicts is

required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

64.     The omission of this material information renders the Registration Statement false and misleading, including, inter alia, the following sections of the Registration Statement: (i) "Opinion of Roth Capital Partners as GenVec's financial advisor" and (ii) "Background of the merger."

65.     Third, the Registration Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

66.     The Registration Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of GenVec's officers and directors, including who participated in all such communications.

67.     Specifically, the Registration Statement indicates that "GenVec's directors and executive officers may have interests in the merger that are different from, or in addition to, the interests of shareholders," including "potential continued employment of executive officers following the merger."  Further, the Registration Statement states that, on January 21, 2017, the Board's legal counsel "advised the GenVec board of directors of its considerations in connection with a potential conflict of interest if Intrexon were to offer the executives of GenVec employment with Intrexon prior to the closing of the transaction with Intrexon."  Additionally, on January 22, 2017, the special committee met and discussed Intrexon's proposed merger agreement, including provisions with respect to "employment matters."

68.     Further, in the joint press release announcing the Proposed Transaction, GenVec's chief scientific officer, Douglas E. Brough, Ph.D., stated: "We are excited to be joining the talented team at Intrexon."

69. Despite these indications that Intrexon will retain certain members of Company management following the close of the Proposed Transaction, the Registration Statement fails to disclose the nature and timing of these conversations, as well as the amount of compensation that GenVec's retained employees expect to earn.

70. Relatedly, the Registration Statement indicates that, on January 21, 2017, the Board determined to create a special committee of the Board to "consider the terms of and negotiate the Intrexon transaction," but it fails to disclose the reason the Board deemed it necessary to form a special committee, including whether it was due to any perceived conflicts of interest.

71. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders. This information, moreover, is particularly material here in light of the fact that Company management lowered the Company's financial projections during the negotiations over the economic terms of the Proposed Transaction.

72. The omission of this material information renders the Registration Statement false and misleading, including, inter alia, the following sections of the Registration Statement: (i) "Background of the merger" and (ii) "Interests of GenVec's directors and executive officers in the merger."

73. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to GenVec's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and GenVec**

74.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

75.     The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  GenVec is liable as the issuer of these statements.

76.     The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

77.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

78.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

79.     The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

80.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

81.    Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Intrexon

82.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

83.    The Individual Defendants and Intrexon acted as controlling persons of GenVec within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of GenVec and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

84.    Each of the Individual Defendants and Intrexon was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

85.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Registration Statement.

86.    Intrexon also had direct supervisory control over the composition of the

Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

87.     By virtue of the foregoing, the Individual Defendants and Intrexon violated Section 20(a) of the 1934 Act.

88.     As set forth above, the Individual Defendants and Intrexon had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.   As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 28, 2017                    **RIGRODSKY & LONG, P.A.**

                                         By:    */s/ Brian D. Long*
                                                Seth D. Rigrodsky (#3147)
                                                Brian D. Long (#4347)
                                                Gina M. Serra (#5387)
                                                2 Righter Parkway, Suite 120
                                                Wilmington, DE 19803
**OF COUNSEL:**                                 Tel.: (302) 295-5310
                                                Facsimile: (302) 654-7530
**RM LAW, P.C.**                                Email: sdr@rl-legal.com
Richard A. Maniskas                             Email: bdl@rl-legal.com
1055 Westlakes Drive, Suite 3112                Email: gms@rl-legal.com
Berwyn, PA 19312
Tel.: (484) 324-6800                            *Attorneys for Plaintiff*